May I please the court, Catherine Tassinari representing Jesse Bailey. Excuse me, ma'am. Mary, is it possible to turn the mic up a bit? I'm having a hard time hearing today. I'll get closer to you. Thanks. I think our sound system could be boosted a bit, too. Thanks. Jesse Bailey suffers from bipolar disorder and borderline intellectual functioning, among other things. Her mental limitations are established by an examining psychologist, Dr. Troon, and by her treating therapist, Kristen Bezdek. I'd like to just focus on the treating therapist issue. In this case, what I think is particularly compelling is we have two lay witnesses. We'll call them lay witnesses under the regulations. We have the treating therapist. Maybe not so much. I'm sorry I brought this up. I think that might be increasing. Try it again. Okay. We have the treating therapist who testified that the claimant, during the times that she'd meet with her and work with her, she tended to be tangential, had a hard time staying on the topic and staying focused, and had pressured speech. Then we had another lay witness that the ALJ called to clarify some of the testimony. That was the woman named Charity McSpirit, who's the program coordinator of the Confidence Clinic. She also testified that Jesse Bailey often would get sidetracked. Sometimes she'd talk so fast they couldn't understand her. She had a hard time staying focused. The ALJ noticed that she had a hard time staying focused and twice warned her to get back on track. What's compelling about this kind of testimony is these two women have worked with the claimant over a period of time, and what their testimony establishes, I think, is that, yes, there's variations in her functioning level, that sometimes she functioned better than others, but they often noticed these other times when she was not focused and had difficulty concentrating. May I ask you one question? The ALJ discounted the testimony of the, I forget the name, not Charity McSpirit. Kristen Bedstack. Yeah. Because, at least in a substantial part, she had been under the impression that the reason Ms. Bailey didn't complete the Confidence Clinic or wasn't able to do it in person was that she was not up to going to the clinic, that it was too much for her. Then the ALJ says that she was mistaken in that because Charity McSpirit told them the reason she didn't come was because of her duties taking care of the children at home. I didn't have an opportunity to read Charity McSpirit's testimony. Is that an accurate statement? I don't believe so, Your Honor, and I addressed it in my reply brief and set out her testimony. Actually, she doesn't say anything about the death and the family or child care commitments. She said she didn't know why, you know, what family things. She says, as I recall, she was having some emotional problems. I don't remember exactly what they were. And then the judge says, okay, there was a death and a couple of other things in the family. And it's certainly true, there were some family crises, no doubt about that. But when I read Charity McSpirit's testimony, it seemed to me that it was quite consistent with the treating therapist and actually supported the limitations that the therapist identified. So I don't see that as a conflict there. You know, we call the therapist and Charity McSpirit are not acceptable medical sources, and we certainly couldn't rely upon them for diagnosis, perhaps, but certainly the observations that they make, the objective things that they notice, should be credited. This is exactly the type of evidence that the agency expects the claimant to produce and that the agency itself tries to collect in developing a case. But they aren't really just lay witnesses, the man on the street. These are people who are working with emotionally disturbed clientele. So I think they have a little bit more weight, too, in how they're looking at things than just a stranger. I see the problem with Dr. Troon this way. Tell me if I'm missing the boat here. He rejected, the ALJ rejected Dr. Troon's opinion because it was based on what the ALJ says was the petitioner's inaccurate rendition of her history, and also that it was inconsistent with what she does, in fact, do every day, taking care of the children at home and so forth. What's the answer to that? As long as he has some legitimate reason to reject the testimony, can't he do that? Even if we would come to a different conclusion, don't we have to give deference to his findings? Well, Dr. Troon's opinion is uncontradicted by any examining or treating doctor. Well, the ALJ said it was inconsistent with Dr. Dean and Dr. Middlecoff. Dr. Middlecoff examined well before the relevant adjudicatory period. He was examining back. She applied for benefits in 1999. That's her onset date under SSI, and Dr. Middlecoff was examining her back. How about Dr. Dean? Dr. Dean did not ever assess limitations, but he did assess a GAF that was very low, 45. How many times did she see Dr. Dean? I think only maybe two or three times. And Dr. Troon once? One time. But Dr. Troon did do testing, and Dr. Dean did not do that. So I think that he did spend quite a bit of time with her and tested her, so I think that gives some greater weight. I understand what you're saying about the history issue, but ‑‑ Is the ALJ correct that she gave him erroneous statements about her history? Well, I go into that in the brief, and really, you know, when I'm faced with a claimant like this, I never really know if I should be arguing the claimant's credibility or not, because they're mentally ill, and they don't stay focused, and they aren't very good witnesses. But I think that she said at one point, I go into the hospital every year, and that was definitely not true, at least as far as we can see. She went in a number of times. And if you look at the times that she went in, in 94, 95, 96, you can see that this is a very disturbed woman. And they thought she was psychotic back then and thought they needed to rule out schizophrenia. And that is very consistent with Dr. Troon's finding of psychotic, psychological turmoil and some likelihood of psychosis. Another problem is that apparently the ALJ found that there are jobs she can do even with her condition, right? Well, to do that, he had to reject Dr. Troon's opinion about what her limitations are. And my biggest problem with where it's step five of the sequential analysis, it's the agency's burden, to prove that there are other jobs she can perform within her limitations, and there were no limitations really, well, if you look at the VE testimony, they really don't address her problems with concentration, which really seems to me to be the big issue that everybody keeps pointing out here, her difficulty in staying focused. So I don't think they established that she can perform jobs. I think I'll reserve what little time I have. Thank you very much. Our sound system problems laid up at least a minute of your time. Good morning, Your Honors. I'm Jeffrey Baird representing Social Security. Dr. Troon took a very dramatic history with the claimant saying that in the previous year she had had these psychotic breaks and hospitalizations and so forth. Are you sure she really said that in the previous year rather than she had a year-long break? What did she say exactly? I'd have to read it, Your Honor. I'd have to. She discussed and stated in very broad terms, sort of vague terms, a dramatic history, and Dr. Troon accepted that history, but then when he found in the examination on the MMPI, she exaggerated, and he felt that was a cry for help, but he sort of never put together the statements in her history and the exaggeration. He did also record some daily activities that would at least require completing one-step tasks, yet he found she was incapable of one- and two-step tasks. So his analysis seems inconsistent with itself and inconsistent with her daily activities, if nothing else. But the ALJ rejected Dr. Troon for those reasons, really self-inconsistency and the fact that he hadn't reviewed the long history of medical records. By contrast, the state agency positions did do that, and one of them actually reviewed Dr. Troon's CE, which is a consultative examination. That was Dr. Henning's. And the state agency reviewing positions, although they would have less weight in the hierarchy of positions ordinarily, did provide a good narrative giving account of the records that Dr. Troon hadn't seen and even Dr. Troon's own findings. So the ALJ relied on those state agency positions for the substantial evidence. The more interesting testimony, I thought, I have to agree with Ms. Tassinari, was Bezdak. That was quite an engaging read, really, going through the entire hearing and seeing how she put together the different events that she'd witnessed in the one hour a month and the treatment and the medication by Zola Yates. On the other hand, there was a continuing confusion in Bezdak's presentation. The claim was life stressors, which may be real, but which we regard as situational, and sort of an underlying pathology. And it wasn't clear that Bezdak or Charity McSpirit were taking account. The ALJ thought McSpirit was taking account of the life stressors, but that seemed to be the confusion in Bezdak's reporting. She saw effective treatment, at least to the extent that the claimant was doing as well as she could be, although Bezdak felt she still couldn't work. But there wasn't a nice distinction between life stressors and underlying fundamental pathology. So that's what the ALJ was getting at. I don't quite understand that. She says very clearly that because of the bipolar, if it were just the bipolar disorder or just the anxiety, she could probably work. But the anxiety feeds the bipolar. She's got no social, she's got all these things. And then she says if she went out and got a job, she would decompensate in about a month. Now you say that's because of stressors. And you separate stressors from an underlying disorder. Aren't there inevitably stressors in everybody's life? Well, taking care of ten people. Well, that's not so clear whether it was ten or not. It was a large number of people and certainly two children five days a week. But you say if she had no stressors, she'd be able to survive. Do you have no stressors? Who has no stressors? Well, Your Honor, the ALJ has- Whether it's taking care of two or five children or whether it's just worrying about how you're going to get it to work for somebody who's bipolar and has anxiety and all these problems. Isn't she going to have stressors? Well, we also include stressors in the Global Assessment of Functioning. And if you have a lot of stressors, you get a lower GAF rating. I agree with you about that. Her testimony is really fascinating, as is the dialogue with the ALJ. I must say the ALJ did as thorough a job as I've ever seen an ALJ do. I mean, he was really interested in developing everything that could be developed, and he should be commended for that. On the other hand, he seemed to think he was a better psychiatrist or psychologist than any of the people who practiced him. Well, he did rely on the state agency physicians. And this case is actually interesting for a point of law in that should the therapist who has a longitudinal relationship be accorded more weight than physicians with MDs and greater credentials but less of such a relationship? Who work for the state agency. Who work for the state agency. Whose job it is to see that the state agency survives the budget crisis. Well, Your Honor, I won't make a comment on that. They are physicians, and they have their obligations as PhDs and MDs to give a reasonable, accurate accounting of the medical evidence. So the ALJ has to have substantial evidence to be upheld, and he's really hanging a lot on these state agency physicians. But they did review all the records. It would have been interesting to have a medical expert or a medical advisor at the hearing to participate in the dialogue with Bezdek and Spirit. That wasn't done, but as Your Honor notes, the development is quite thorough and complete. And the ALJ resolved the facts the way he did and spent I think fully three pages going over the Bezdek testimony. He gave her a great deal of consideration. So as a matter of result. I think he did confuse a couple of things. Listen, I was confused about the Albertson's job. He seemed to think that that was in 2000, and the Albertson's job was really in about 1995. No, no, the Albertson's job was in 1999, wasn't it? I think we're all confused. I think she did leave that job within a month. So I don't know that that was a proper reason for the ALJ to discredit her. It might even show she can't sustain work. But it was simply one data point in many in this complicated record. And the ALJ did an admirable job trying to resolve it all. And I don't know what more he might have actually done on the development front. What he did was, I would argue, as Professor Mishaw calls it, bureaucratic justice. Good enough. Complete enough. And that's where I rest my case at this point, unless there's further questions. Thank you. Thank you. I want more than bureaucratic justice for my client. When you have an uncontradicted examining psychologist, the ALJ has to give clear and convincing reasons, and I would submit that he didn't. Particularly on this MMPI. The MMPI, I've set it out verbatim on page three and four of my reply brief. There's four full pages of mental problems that were identified in this MMPI. And in those four full paragraphs that indicate a significant amount of psychological turmoil, tending to experience psychotic symptoms, confusion, disorientation, and so forth, there's one sentence, and it says, they may be exaggerating deviance as a cry for help. And so in those four paragraphs, that is what the ALJ focused on, to say that my client was being less than truthful. I think that every other piece of that MMPI should be given the same consideration, and that a very different decision would be reached. The examining psychologist has the training to interpret the MMPI. He did not think it was invalid, nor did he say that she was exaggerating. What do you say about your client's decision that the ALJ has a right to rely on the doctors who subsequently examined the entire record, including Dr. Troon's report, and reached their medical conclusions? Well, Your Honor, this circuit has a hierarchy, and treating and examining doctors come first. There's two problems with the doctors that examined the record. One, examined the record before Dr. Troon did any testing, and before my client, very early in the adjudicatory period, and before she was starting to receive treatment from Douglas County Mental Health. And then the other doctor didn't give any reasons why he did take a different position from Dr. Troon. He gave no explanation for it. Which doctor is that? It was a... I'm sorry. I tend to think of them as those DDS doctors. I believe it was... Was it Value or was it Hutt? I believe it was Hennings. Was it Hennings? I think it was Hennings. Did he report in the record Dr. Hennings? I'm going to... Well, I'm not finding it. But I believe that the second one to comment, who did have Dr. Troon's opinion, did not actually make any explanation of why he disagreed. Okay. It was at transcript 374, 385. That was Dr. Hennings as the second one. 374 to 385? Yes. And I guess I'd rely on Matney v. Sullivan that he filled out a form and he didn't give any written explanation. The problem with what they're doing there is sometimes they do give narrative, the DDS doctors do, but often they just check the boxes. And in this case, I don't believe there really was any narrative explaining differences between Dr. Hennings' opinion and the treating records and examining records. All right. I have nothing further, unless there's other questions. Thank you. Thank you, counsel. Thank you both very much. The case to adjourn will be submitted.  Thank you. Thank you. The case. The argument is that the freedom of expression is a point of no return.
judges: Reinhardt, Silverman, Clifton